IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:25CR562 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | |
| | ) | |
| JONATHAN LEISSLER, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, David M. Toepfer, United

States Attorney, and Megan R. Miller, Assistant United States Attorney, respectfully submits this

memorandum setting forth the United States' position regarding the sentencing for Defendant

Jonathan Leissler. For the reasons set forth below and those to be articulated at the sentencing

hearing, the United States respectfully submits that a sentence at the high end of the Guidelines

range set forth in the PSR and the parties' Plea Agreement is appropriate in this case.

## I.  APPLICABLE LEGAL STANDARDS

A well-established legal framework guides the Court's sentencing determination. The

advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v.

United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807

(6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate

and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an

important institutional role: It has the capacity courts lack to 'base its determination on

empirical data and national experience, guided by a professional staff with appropriate

expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

## II.    SENTENCING GUIDELINES COMPUTATION

The United States concurs with the Guidelines calculations set forth in the PSR and the parties' Plea Agreement.  (PSR, Pages 8-9; R. 15: Plea Agreement, PageID 86).  Leissler's base offense level is 7 under U.S.S.G. § 2B1.1(a)(1).  An 18-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(J) because Leissler intended to cause loss in the amount of $4,598,118.39.  An additional two-level enhancement applies under U.S.S.G. § 3B1.3 because Leissler abused a position of trust, which significantly facilitated the commission and concealment of his offense.  After a three-level reduction for acceptance of responsibility and a two-level zero-point offender reduction, Leissler's total offense level is 22.  Leissler falls into Criminal History Category I.  At an offense level 22 and a Criminal History Category I, Leissler's advisory Guidelines range is 41 to 51 months.

## III.    APPLICATION OF § 3553(A) FACTORS

### A.    NATURE AND CIRCUMSTANCES OF OFFENSE[1]

Leissler stole $4.5 million from three victims in less than three years.  The latter half of his theft spree occurred while Leissler was actively campaigning for election to the Ohio State Senate, touting his personal integrity and commitment to fiscal accountability.  He used the stolen money to fund his (ultimately unsuccessful) political campaign, purchase a vacation home in Myrtle Beach, South Carolina, charter private flights, and spend exorbitantly for himself and

---

[1] The United States also refers the Court to the description of the offense conduct included in the PSR and the parties' Plea Agreement.  (PSR, Pages 5-7; R. 15: Plea Agreement, PageID 88-95).

his family.  The nature and circumstances of this offense counsel in favor of a sentence at the high end of the Guidelines range contemplated in the PSR and the parties' Plea Agreement.

### 1. Leissler Embezzled $3.8 Million in Fake Payroll from Victim 1.

Most of the $4.5 million that Leissler stole—$3.8 million of it—came from his employer, Victim 1, a Warrensville Heights-based distribution and industrial supply company.  Victim 1 hired Leissler at a comfortable salary in March 2022 as its Chief Financial Officer, a position that entrusted him with managing payroll, expenditures, and accounts payable.  Yet within a month of his hiring, Leissler exploited that trust and began adding unauthorized money—payroll, bonus, commission, and other miscellaneous payments—to his paychecks.  In April 2022, Leissler cut his first extra bogus paycheck to himself for $5,040.  Each pay period thereafter through November 2024—approximately 70 in total—he continued stealing money from Victim 1, adding unauthorized payments to his regular paycheck and creating separate, additional paychecks with wholly unauthorized payments.

During this time, Leissler's theft from Victim 1 escalated in scope and scale.  He increased not only the sheer number of fake paychecks he cut himself per pay period, but also the amount of money he stole with each check.  For example, in 2022, Leissler wrote himself an average of two extra paychecks per pay period; by 2024, he was cutting an extra ten.  Similarly, in 2022, he stole approximately $6,500 per pay period, which, by 2024, he drastically increased to a whopping average of $95,000 per pay period.  Indeed, on one occasion in August 2024, Leissler took as much as an additional $130,000 in a single pay period.  In total, Leissler created 464 fake paychecks and stole $3.8 million from Victim 1.

To cover his tracks, Leissler created false entries in Victim 1's payroll records, accounts payable ledgers, balance sheets, and monthly financials statements, all of which were designed to hide and understate the cost to Victim 1 of Defendant's theft.  Leissler also lied about the state of

Victim 1's finances to its employees and zealously guarded other employees from accessing Victim 1's payroll records.

Leissler's theft, and his efforts to hide his fraud, had significant and far-reaching consequences for Victim 1. As set forth in Victim 1's impact statement, beyond the sheer scope and volume of Leissler's theft—which, were it not uncovered, threatened to bankrupt the company—Leissler's fraud had collateral consequences. It caused Victim 1 to incur and pay additional Medicare and Social Security taxes on Defendant's falsely inflated salary; it caused Victim 1 to take out a $3 million loan to cover its losses; and it caused Victim 1 to endure the time and expense of a civil lawsuit to recoup what little it could of its money. Leissler's conduct also took an emotional and psychological toll on the employees of Victim 1. As its owner explained: "What makes this especially devastating is not only the money [Leissler] stole, but the deliberate betrayal of trust and the damage he inflicted on the people and the integrity of the company."

2.      Leissler Funded His Political Campaign with Victim Funds.

But Leissler did not stop at stealing $3.8 million; in addition to his payroll scheme, Defendant also obtained unauthorized access to Victim 1's credit cards. While continuing to betray Victim 1's trust with this conduct, he simultaneously left another victim—Victim 2—in his wake. Leissler used Victim 1's credit cards, without authorization, to rack up over $700,000 in contributions toward his Ohio State Senate campaign, which Victim 2 processed on its online payment platform. After he lost the general election and after Victim 1 confronted him about his embezzlement, however, Leissler tried to cover his tracks. Leissler had Victim 2 reverse the credit card charges knowing that he left Victim 2 with no way to recover those funds from him— days earlier, Leissler closed his true bank account, deleted that account from Victim 2's

4

platform, and gave Victim 2 information for a fake bank account that he knew did not exist. Victim 2 thus was left holding the bag for Leissler's unauthorized credit card charges.

3.      Leissler Embezzled from Victim 3, a Local Fraternal Police Organization.

And still yet, this was not the only trust that Leissler breached over the duration of his scheme. Indeed, Leissler's first victim chronologically was Victim 3, a local Fraternal Order of Police organization from which Leissler, as Treasurer, began embezzling in February 2022. Over the next two and a half years through November 2024, Leissler wrote checks to himself from Victim 3's bank account, withdrew cash, and even paid his own personal credit card bills with Victim 3's money. Ultimately, Leissler stole over $50,000 from the organization on 69 separate occasions. Proportionally, as Victim 3 indicated in its impact statement, that money amounted to 80% of the organization's funds, which were earmarked to provide scholarships for children of police officers. As with Victim 1, Defendant tried to cover his tracks by capitalizing on the trust Victim 3 bestowed in him, regularly reporting at Victim 3 meetings that the organization's funds were just fine. And again, as with Victim 1, this breach of trust—well beyond the sheer theft of the funds—significantly impacted the organization's members. As its representative explained: "When this became public news we lost members, donors, and the public trust. The organization had to start from scratch. Its [sic] hard to put into words the betrayal we feel from someone who was supposed to be a friend."

4.      The Scope and Breath of Leissler's Fraud, His Lies and Abuse of Trust, the Impact on his Victims, and His Brazen Political Campaign Support a Significant Sentence.

Leissler stole $4.5 million from three victims in less than three years. This long-ranging and widespread offense conduct was not isolated or aberrant; instead, Defendant chose 597 times—464 for Victim 1, 64 for Victim 2, and 69 for Victim 3—to steal from his victims for his own financial gain. He also chose to cover his tracks, falsifying book entries for Victim 1 and

5

lying to Victim 3 at board meetings.  These choices, along with the accompanying breaches of trust, had significant financial, emotional and reputational consequences for his victims.  This alone counsels in favor of a significant guidelines sentence.

What makes Leissler's fraud even more egregious, however, is his simultaneous campaign for the Ohio State Senate.  Defendant held himself out through his campaign as a person of integrity with a strong financial background, whom the public could and should trust to represent them in the State legislature.  Indeed, in a 2024 Ballotpedia Candidate Connection survey,[2] Leissler stated that he was personally passionate about "budget and finance (obviously based on my background)."  That Defendant attempted to capitalize on his background as an accountant to gain the public trust while simultaneously pocketing millions of dollars that did not belong to him is blatantly disingenuous.  Even more, however, Leissler also stated in that same survey that "integrity" was the most important characteristic for an elected official.  Yet while Defendant intentionally sought a position of public trust, he was grossly abusing the trust given to him by Victims 1 and 3.  And he sought such a position (and certainly did not inform the public) by financing his campaign almost exclusively with stolen funds.  Leissler should not be permitted to trade on his history of seeking public trust while simultaneously breaching it in private for his own financial gain.

The nature and circumstances of Leissler's offense conduct thus support a sentence at the high end of the Guidelines range.

---

[2] Available at: https://ballotpedia.org/Jon_Leissler#Campaign_themes (last visited April 3, 2026).

Leissler argues that his personal history and characteristics constitute mitigating factors for this Court at sentencing, focusing primarily on his post-arrest conduct and his family relationships and support. But these factors—either alone or together—do not support a sentence other than the high end of the Guidelines range.

Leissler suggests that his conduct in voluntarily repaying a fraction of what he owes to Victims 1 and 3 (and nothing to Victim 2) constitutes a mitigating factor at sentencing. (R. 19: Def. Sent. Memo., PageID 171-72). What Leissler conveniently overlooks, however, is that those efforts—to the extent they may even be deemed voluntary—occurred only after Leissler was caught. On the day of the general election, November 5, 2024, Victim 1—not Defendant—exposed Leissler's theft. While Leissler was out of the office presumably campaigning, another Victim 1 employee noticed the large campaign contributions charged to Victim 1's credit cards and questioned the company's owner about their validity. The snowball effect of that discovery soon revealed the payroll fraud, at which point Victim 1 confronted Leissler. It was only in the days that followed Leissler tried to cover his tracks, reversing approximately $10,000 in Square payments to Victim 3 and requesting refunds to Victim 1's credit cards from Victim 2's payment platform (leaving Victim 2 responsible for the loss).

Other than those self-serving actions, Defendant made no repayment efforts following Victim 1's confrontation, forcing Victim 1 to file a civil lawsuit. After months of protracted litigation, the parties finally settled on a series of forced liquidations and asset sales through which Victim 1 has recovered a mere fraction of what Leissler stole from the company. So while Leissler may have "already paid" approximately $652,000 to Victim 1, *see* R. 19: Def. Sent. Memo., PageID 172, those payments came about only after Victim 1 was forced to incur the time, legal expenses, and associated hassle of filing a civil lawsuit against Leissler. At no point

did Leissler voluntarily disclose his conduct or attempt to repay any victim of his theft until after he was caught.  Leissler's post-confrontation, eleventh-hour efforts to recast his narrative should not be considered mitigating factors at sentencing.

Second, Leissler submits testimonials from family and friends, attesting in various ways to Leissler's good attributes, such as kindness and generosity.  But this is routine in white-collar cases, and nothing in the letters is particularly remarkable.  *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants . . . continue to receive the love and support of their families" and "[m]any, in turn loves their families and friends . . . and participate in charitable activities").  Importantly, while Leissler's family and friends highlight his generosity, Leissler neglects to mention that his theft facilitated this same "generous" conduct.  This was not Leissler's money to spend; it belonged to his Victims.  So while Leissler may have been able to give generously to friends and family, it was no doubt easier to do so with money that did not belong to him.  The Court should decline to treat this conduct as mitigating.

Leissler also highlights the impact of his incarceration on his (soon-to-be-ex) wife and two daughters.  The government is not unsympathetic to the financial and emotional burdens that a defendant's incarceration can—and typically does—create for family members.  Indeed, this is no doubt true for most when a spouse or parent goes to prison.  Fortunately here, however, there is no indication that Mrs. Leissler is unable to work or otherwise provide financially for her children.  It also appears from the support letters that the Leisslers—and certainly Mrs. Leissler and her children—have a loving and supportive extended family who stand ready and willing to assist however they may.  So while the family may be unable to match the lifestyle to which they become accustomed, that is clearly not the standard—criminal sentencing does not require that

incarceration leave the remaining family living according to the financial standards to which they have become accustomed, particularly when those standards came about because of the Defendant's criminal conduct.

At bottom, it was Leissler's choices herein—not those of his victims, this Court or the government—that have placed his family in their current situation. The regrettable ramifications of those choices should not be considered mitigating at sentencing. *Cf. United States v. Valdez-Flores*, No. CR 11-2367 JB, 2012 WL 2384103, at *29 (D.N.M. June 12, 2012) (declining to depart based on argument that defendant was primary financial support for his family because "[f]amily members often suffer from the choices defendants make, [and] the Court does not believe it is appropriate to depart on this basis").

## IV.    <u>CONCLUSION</u>

The offense conduct and other relevant factors fall within the scope of circumstances contemplated by the Guidelines, and a Guideline sentence thus will accomplish the goals of 18 U.S.C. § 3553(a). For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a sentence at the high end of the Guidelines range set forth in the PSR and the parties' Plea Agreement.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:    /s/ Megan R. Miller
Megan R. Miller (OH: 0085522)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3855
(216) 522-8355 (facsimile)
Megan.R.Miller@usdoj.gov